Good morning. I would like to reserve two minutes. May it please the Court, my name is Frank B. Hugg, and I'm appearing on behalf of Petitioner C-Logix, LLC, a warehouse and trucking company based in Oakland, California, but serving the entire harbor of San Francisco Bay and also serving points and harbors inland as far as Sacramento and Stockton. Sounds like a good commercial. Thank you. I hope you might have the services of Sealink. Its employee and respondent, Willie Booker, worked as a truck driver. In the trucking industry and on the waterfront, Booker had a subappellation as a street driver, local driver, short-haul driver, or city driver. There are good reasons why he had those titles. Booker filed a claim for benefits under the Longshore and Harbor Workers' Compensation Act as a result of cumulative injury to his wrist and back. C-Logix contends that the ALJ properly found that there was no covered status under Section 2.3 of the Act and denied the claim for lack of jurisdiction or coverage. The BRB reversed on erroneous grounds, in our opinion. This petition for review on those, that thumbnail of the facts, presents a very narrow question that was conspicuously and intentionally left unanswered by a panel of this Court from its 1987 decision in Doris v. Director. So Doris doesn't, isn't dispositive of this case? No. You're saying, all right, so neither of you can, you know. But I've got good reasons why it should be dispositive and it should be reversed. I'll concede. Wait. You think we should reverse it? You should reverse the board. Oh, okay. Doris is good law. Okay. We can't, you know, as much as we'd love to sometimes, we can't reverse other panels without going on bond. Well, probably Judges Tehima, Wallace, and Buchiever wouldn't appreciate that either on Doris. But there are good reasons why Doris is correct and applies to this case, and I'll take it right to the heart of the job duties upon which my esteemed colleagues from the Solicitor's Office and also from the Claimants National Bar peg their case. That is, they contend it is an anomaly that Booker had an intermediate position and could be excluded under the Act where the persons on both sides of the work, the driving he was doing, was covered. I concede it's an anomaly, and I concede for purposes of this oral argument and the entire record, that the longshoremen working in the marine terminals, the ILWU members who are unloading the ships, taking the boxes from via the crane and scattering them around, marshalling them around in the marine yard, are covered, and the workers at the other end of the container freight station are also covered as they stripped or stuffed the boxes. The question is, however, Booker and Doris, they're the exact same facts. The Court implies by its description that there were covered workers on both sides of where Doris traveled as he went about short distances, no greater. Mr. Hugg, help me out, if I want to help you out, with this language from Pfeiffer versus Ford. Status exists if he is, quote, engaged in intermediate steps of moving cargo between ship and land transportation. That's a 1979 Supreme Court case. Now, you have just told me that the shipboard workers are covered because they're on ship, right? Sure. And longshoremen are covered because they're unpacking what the shipping people have packed. And your man is in between. Now, isn't that intermediate? That's an anomaly. No, no, no, no, no. It's an intermediate anomaly. It is. But it's not an anomaly. I'm not asking what the effect will be if we find it's intermediate. I'm saying, is he engaged in the intermediate steps of moving cargo between ship and land transportation? All right. Taking the case you've cited. It's got to be intermediate. Intermediate, if it has any meaning, means between two things, right? Right. I agree. But taking the decision you've cited by Mr. Justice Powell and taking the facts of that case, Ford and Bryant, Ford was moving military vehicles from the port to a flat car. Bryant was taking the cotton from the opposite direction to the ship. Mr. Justice Powell in that decision clearly indicates that the truck driver who had brought the cotton to Bryant was not covered, and the truck driver or the driver of the locomotive who was taking away the military vehicles was likewise not covered. So Mr. Justice Powell said that. Where did the truck driver get his cotton? It was for points inland. Of course he did. But that's not an intermediate carrier. It's an intermediate carrier. An intermediate carrier between the ship and the terminal or the CFS where they're unpacking. All right. Well, I've got the answer. Maybe this one will be better. All right. If intermediate is a term of artifact because that means it's covered, I agree. The board uses that analysis. So if you label it intermediate, it's covered. But there are lots of anomalies on the waterfront. There are people all over the marine yards, the stringer, which is that part right next to where the ships come, a quarter of a mile inland. There are lots of people who are not covered. Well, let me ask you this. I'm sensing, obviously, I don't want to in any way minimize it's important to your client and it's important to Mr. Booker. But I'd like to look at why this is important a little more generally. I'm glad you asked that. And I note that the director weighed in on this and against you. And while the director isn't exactly, you know, I would say the director wouldn't necessarily be totally aligned with Mr. Booker or his ilk, as it were, that group of individuals. So, you know, to the industry, when the director is saying this is the way we want to interpret it, why wouldn't we give this some sort of deference? Because I'm assuming that probably, you know, I bet on this side of the bench, we probably have people that have more expertise practicing in this area than we do on this side of the bench. But we're going to decide this case. So I'd kind of like a little from both of your perspectives why this might be even why this is really important. It's a tiny group on this side of the bench. But to answer the question about deference, I agree that there's discussion in prior decisions of deference. And in fact, as I've conceded the last oral argument, once in a while the industry will agree with the position of deference to the director. However, that's the law. It's discussed by the Supreme Court prior decisions of this panel. However, deference can only be due where the underlying argument is reasonable. And also, if it's not taken for a litigation purpose or whatever, and so I'm trying to ascertain here, was this position taken previously by the director? Is it a position that continues to be taken? Or is it, you know, obviously when there's a litigation motivation, we look at that and the answer to that is There's so very few truck driver cases that come up, and it goes to the answer to your first question, why is this important? It's important for what the Court said in Doris. We need this circuit, the largest in the land and the largest coast, needs to have some clear lines, not gray areas. Now, take and Doris keeps saying we don't decide today whether or not between different harbors. What is a harbor? San Francisco Bay is one harbor. So let's suppose Booker, instead of going from the marine terminals next to the container freight station, that activity back in shuttle, as it's called, let's suppose he went from Oakland to Stockton or Oakland to the port of Redwood City. If he went to Redwood City, it all would be within the harbor of San Francisco Bay. So what is the logical reason for seeking out uniformity of coverage to classify those two drivers who are doing the exact same duties, driving a truck over the public highway as licensed under a certificate issued by the Federal Motor Carrier Safety Act, part of the ICC, a land-based stream of commerce? And the question is, what is the point of distinguishing industry-wide between the truck driver who goes 100 yards, maybe a mile down the road, or maybe a mile and a half? In industry, it's important. Are there any regulations that would help to clarify this? Or is this purely a litigation position? No. There are no regulations. In fact, the term harbor worker, as even Mr. Justice Marshall pointed out at the beginning in 1977, the deposition of harbor worker is not defined, and there is no definition in the legislative history. However, the legislative history cited by Mr. Justice Marshall and in footnote 27 gives us a wonderful example. Take a typical example. A truck driver who enters the marine area, a covered situs for pickup and transshipment or delivery, an intermediate step, is not covered. Mr. Justice? Why do you say it's an intermediate step? It's not an intermediate step. I added that. Mr. Justice Marshall didn't say that. Well, if we published on this, we could make it brighter, but we — we could make the line brighter, but would we make it more correct? How are you going to — it's going to be a tough nut for this panel, with all due respect, to distinguish doors. You're going to have to say, oh, because Willie Booker was working all within the harbor of Oakland, our port of Oakland, there's some dispute about that. But because Willie Booker was working within the harbor of Oakland, he's to be treated differently than Mr. Dorris, who went from the harbor of Long Beach next door to the harbor, contiguous harbors of Los Angeles? Suppose that the drivers in Puget — Well, you said it doesn't exactly answer the question, so I think we can distinguish doors. It's just a question of — But why would you want to? Well, I know you don't want us to, but I don't know. You know, that's the — the director, obviously, you know. I mean, there — apparently, there are — apparently, there's something to fight over here. And — Well, the trucking industry is substantial and remains, in large part, completely excluded from the Longshore Act. It's only this short area, and I think it converts — the director's argument, in effect, converts the twofold requirement that the 72 amendments imposed to a single requirement of status only. If they're at a location nearby — No one's arguing situs here. Correct. He satisfies situs, right? The argument to answer to — there is coverage until the stuffing and stripping is completed, in effect, makes it a situs argument. It's the director who's trying to resuscitate the point of rest or geographic boundary, because only by that argument, namely until the stuffing or stripping is complete, can the director argue that Booker was covered as an intermediate step. But isn't that the problem that the board said the ALJ got into? Because the ALJ reasoned this case based on point of rest, right? No. Point of rest was never mentioned by the ALJ, never heard in the record, and was raised very cleverly long after the fact and not at the — first at the BRB appeal. It appears nowhere in the transcript, nowhere in oral arguments, nowhere in closing briefs. This is not a point of rest case. This is an occupational test of what a truck driver does. Drive an 18-wheeler. All right. Well, you're over your time. I'm sorry. We'll give you one minute on rebuttal. Thank you, Judge. Because we've asked you questions. Thank you. Good morning. May it please the Court. I am Joshua Gillelan, appearing on behalf of the claimant, Willie Booker. I will endeavor to use only half of the time jointly allotted to me and Ms. Rapolo so that you may hear from her on behalf of the director. Mr. Gillelan, I think we'd like to hear why we shouldn't apply DORIS. Well, because DORIS is not applicable. Okay. The transfer of the containers in DORIS from one port to a different port was transshipment in terms of the legislative history that are central to the Supreme Court's analysis. So if in DORIS, just before DORIS occurred, the two ports had been merged into one port, instead of being, I think, Long Beach, Los Angeles, or San Pedro. Let's say we're now going to have a big port called San Pedro, Los Angeles, and Long Beach. It's all going to be together. One port. Southern California port. That's it. Then you'd be covered. Your question brings to the front of the case what I think is the critical thing. What is transshipment over land? And if this container is hauled from one port facility to another port facility that constitutes transshipment over land, then that breaks this integral process, this overall process of unloading the ship, which we know from the Supreme Court's cases does include the entire process of getting the car. In the case of full container loads, I don't think there's any dispute. That container comes off the ship. It gets placed in the marine yard. And the consignee's truck drivers are sent to pick it up. And, yes, they enter the marine terminal, and they may do something there more than back their tractor up to that container and chassis and haul it off. But regardless of that, I think what they do there, their presence at the marine terminal, is solely for purposes of picking up the cargo for further transshipment. I think that means that truck driver is not covered, even if he does some incidental things within the terminal. But you don't have to address that. There might be some reason to question it, or it may depend on how much the truck driver does there. But in any case, that truck driver falls within the description of being present at the marine terminal only to pick up cargo for further transshipment. When Mr. Booker does that same thing, when he pulls into the yard with his over-the-road tractor, hooks up to a container on a chassis, and hauls it 20 miles inland, 50 miles inland, I think that was the limit of the short haul. Yes, he is there solely to pick up cargo for further transshipment. But when we have less than container loads, or we have even full containers that are not going to leave the port by truck, but are going to leave the port by rail, then what he is doing in moving that container from the marine yard to the container freight station or down Maritime Boulevard to the rail terminal, that's not the transshipment overland that the example in the legislative history, and hence the Supreme Court, are talking about.  Because he doesn't go out of the port. He doesn't go out of this overall. The Port of Oakland actually can be divided as one huge area that this was one end of, and the rail. I think that's what he's saying where they're conflating situs and status, is because he doesn't go off the situs, that therefore he attains status. Is that what you're arguing? I'm seeing nods over there. At least I got the argument. I don't know that the... Yes, what I'm relying on is the fact that on those trips, he does not leave the port. If you're on situs, then you have status? No, absolutely not. Because he is on the situs with respect to those containers that he just picks up there and takes inland. The fact that he's within the terminal does not give him coverage. It only gives him situs. And Mr. Booker is going to be that fairly unusual employee who is covered for part of his work and not covered for part of his work because he lacks situs. If his injury happens off the waterfront, he's not covered. End of story, because of the situs requirement. But his status is in part as a terminal worker, a marine terminal worker, just like in the more conventional organization of the same function. I mean, this is very unusual. What we have here is the legacy of the old sea land. Mr. Hugg actually referred to his client, I believe, this morning very briefly as sea land. This is a fallout from sea land, an intermodal carrier, which always makes for the most difficult. I need you to wrap up because you're in your... This intermodal arrangement makes for the most difficult line drawing in these cases. The way the industry is ordinarily organized is that the marine terminal operator does all of these functions that we're relying on here, but SeaLogix now combines one corporate entity to do both those marine terminal functions and the over-the-road hauling. Okay. Thank you. All right. Thank you. All right. I'm going to give the Director five minutes. Good morning. May it please the Court. My name is Rita Rapolo, and I represent the Director of the Office of Workers' Compensation Programs. I think the first thing I'd like to do is address the assertion that it's the Director's position that all it takes is a claimant being on the situs. And... Well, I guess first, do we give you any deference?  I think that there's a regulation here, and there's no evidence in the record that this position was taken prior to this litigation or anything along those lines. So are you just making a good argument, or is it entitled to any deference? We have not made a con... As far as I know, we've never made a contrary argument. But actually, this is a case where I believe deference doesn't come into play, because the Supreme Court has addressed the issues that are before the Court here. The Supreme Court has said that maritime employment can involve loading and unloading, that it can involve multiple steps, and if a worker's involved in those multiple steps, it's involved in an intermediate step, that is maritime employment. And the Supreme Court has said that if containers are involved, and if those containers need to be stuffed and stripped, then until it's done, until that's done, the loading and unloading is still being done. And for this last point, I think it's – if we just look at one activity that Mr. Booker was involved in, and I'm not going to go into the details of this, but I think it's important to note that this employment has to be maritime employment for a status requirement to be met. If we just look at what he did, when the container would be taken off from the vessel, put on the ground at the terminal, then Mr. Booker would take that container would be put on Mr. Booker's car, on his truck, and he would transport that to the CFS, the Container Freight Station, where it's unloaded there. After it's unloaded there, it is – that container is stripped, and what that means is that that container would have had contents – cargo belonging to different consignees, so it has to be divided up. The Supreme Court has said that if that still needs to be done, then the unloading of that vessel is not complete. And here that needed to be done, and Mr. Booker drove the truck so that that duty was able to be done. That function was able to be done. It's not a matter of deference to the Director. This is what is happening. Kennedy. You rely on Northeast Marine Terminal Company, the containers. Until the containers strip, the unloading process is clearly incomplete. I'm sorry. Yes. And so there can be no doubt that, you know, for that duty, he – Is there any problem with Doris for this argument? No. No. How do you distinguish Doris, or how is Doris not controlling? Doris had two holdings. The claimant in that case, the containers were unloaded from the vessel, and the claimant in that case had the containers withdrawn on his truck, and he just took it off to the consignees. It didn't have to be stripped. Nothing had to be done with it. It was done. And this Court said, no, the minute he took that truck off, that's the unloading – that's not the unloading process. That's transshipment. And that was one holding. And that issue was not before this Court, because we have containers that needed to be unloaded. Mr. Brooker did do some of that work, but that's not what we're concerned with. That's not what we're talking about with Mr. Brooker, the containers that needed more work to be done. Then so that holding has no implication to our case. And then also the difficulty, because taking Doris, your idea that once he's got his load and he goes out the door of the port of Long Beach to, I guess, the port of Los Angeles, the cargo hasn't changed at all. It's still in the container. He takes it over to the next ship. That's transshipping, all right, according to you. Now, hold that idea in mind and think about the next situation. Booker gets his load and takes it not to another port, not from Oakland to San Francisco, if San Francisco is a port still, but he takes it to a railhead. And there it's loaded and it takes off. Now, you say that that is not transshipping. What's the difference between going from boat to boat or boat to rail? The difference is that there needed to be one final and your rail situation is the Ford decision, the Ford Supreme Court decision, where the container was put on on Mr. Ford's – no, I'm sorry. The container was put on a truck. It was – no, there were vehicles that were taken by truck to the railhead. And they were put on rails, and Mr. Ford just attached – his job was to attach them, and the Supreme Court said that was the last step in the unloading process, the putting it on so it was ready to go off, that car was ready to go off. So from ship to railhead is all included under the Longshoreman Act. But from ship to ship, if it goes to a different port, it's not. That's Doris. Doesn't that cause you to scratch your head? How about with the Doris decision is that we don't really know a lot about the facts, like what the reason was that that was going from one port to the other. Does it make any difference? These cases are so fact-bound that I think it could. For instance, in our case, Mr. Corker had, you know, let's say four different types of jobs that we believe do individually satisfy the status requirement. And one of those jobs was what would happen is at the container freight station, the container would be stuck. Everything would be put into the container. It would be taken – or whatever had to be done. It was taken to the terminal so it could be put on that – I need you to wrap it up. You're way over your time. Okay. So it could be put on that ship. But that ship was too full or was late, so it got put to the next – Mr. Corker would have to drive to the next terminal. That's still in a way part of the loading process, because that container is trying to find a ship to have that container put on. But I guess just to sum up, it's just very important to understand that whatever the implications of DOORS is, at minimum, it applies to only one of Mr. Booker's four distinct activities that we believe satisfy the status requirement. All right. Thank you. Mr. Hug, you're going to solve the problem between ships to railhead, which is all along shore under Pfeiffer, and ship to ship on another port, which is trans-shipment and is DOORS. I'll try. The trans – I'll solve it by answering the court's hypothetical about the creation of a super harbor. That's exactly where the industry is going. All the harbors are merging. So the distinguishing factor between DOORS going between – and the Ninth Circuit did not use the word port, which my colleagues bring up repeatedly. The Ninth Circuit used the word harbor. It's certainly an argument. It's certainly tenable by the common – by use of common language that all of – all the deliveries within the harbor of Oakland should be covered by the DOORS reasoning. But I like the – I'm not sure that I answered the court's – I'm sure you didn't. All right. We have a minute, so let's get to it. All right. Well, let's suppose that the Ninth Circuit and all of the – started holding its arguments in Hawaii for a year, and each of the judges for that year wanted to ship over a car. And each – and this happens, by the way. This is exactly what SeaLogix does. They put a bunch of different cars, and they ship them off to Hawaii. Let's suppose that car – that shipment was delayed. It was trucked down the street to another terminal. It doesn't matter to the person who owns the car. It doesn't matter to the trucking company. It doesn't matter to Willie Booker whether or not that is stuffed or stripped. His job is land transportation, as DOORS's job was also. The Court makes clear in describing harbors and his duties of driving a truck that it's the occupational, functional duties. Shuttle drivers up in – people who move between different parts of the same port are excluded from the Longshore Act. To the mere fact that Mr. Booker was carrying cargo, he was still a truck driver, and I believe DOORS is controlling. I thank the Court. All right. Thank you both for your argument. This matter will stand submitted. The Court is now in recess. Thank you.
judges: Archer, Callahan, Bea